MARCUS H. HOWES *vs.* TOWN OF BARNSTABLE & others.

Barnstable. November 10, 1933. — February 15, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, DONAHUE, & LUMMUS, JJ.

*Shellfish. Flats. Deed,* Construction. *Adverse Possession or Use. Public Officer. Trespass.*

On all the findings by a master in a suit in equity, it was *held,* that the plaintiff had failed to establish title to a certain flat in the harbor of the town of Barnstable by virtue of certain deeds to him in 1930.

It appeared in the suit in equity above described that for a number of years the plaintiff, under licenses issued to him pursuant to Sts. 1911, c. 499; 1914, c. 43, and granting the exclusive right to cultivate and take clams on the flat, cultivated clams thereon artificially and derived considerable income from the digging thereof; that after the expiration of the licenses in 1926 and 1927, the selectmen refused to renew them and in 1927 closed the flat and other flats; that thereafter the plaintiff, to exclude the public, covered the deposits of clams on the flat with nets which were laid flat on the surface and were strong enough to prevent effective clam digging, and set up "no trespass" signs on stakes; that in 1930 the selectmen opened the entire harbor to the digging of clams by any licensed citizen of the town, with certain restrictions; and that shortly thereafter, by order of the selectmen, the nets and signs placed by the plaintiff were removed. The suit was commenced about a month later. The plaintiff sought to enjoin the town and the selectmen from trespassing upon the flat and interfering with his use of the clams thereon and sought damages. *Held,* that

(1) There was no merit in a contention by the plaintiff that, even if he had no title to the flat by virtue of the deeds, he had title as a disseisor good against anyone except the owner of the flat: the spreading of nets and the erection of signs on the flat without ownership and without enclosure were not effective to destroy the public right to take shellfish on the shore and the flat below high water mark and within one hundred rods of the upland;

(2) Between the times of the expiration of the plaintiff's licenses and 1930, the clams in the flat became a part of the public shellfishery in the harbor despite the artificial cultivation done by the plaintiff during the period when his licenses were in force;

(3) The plaintiff had no right of action in the nature of trespass against the individual defendants, who, as public officers, asserted the rights of the public in the clam fishery under G. L. (Ter. Ed.) c. 130, § 84;

(4) The suit could not be maintained.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Barnstable on July 17, 1930, and afterwards amended, against the town of Barnstable and its selectmen.

The amended bill is described in the opinion. The suit was referred to a master, who found that "About April 2, 1930, the plaintiff entered again upon the area . . . and intending to exercise rights of ownership and, to exclude the public, covered certain of the thickest of the clam deposits . . . with nets laid flat on the surface and by 'no trespass' signs on stakes. . . . On June 19, 1930, the selectmen ordered the clam warden to remove the nets 'at once.' The harbor master issued to the same official a similar order on the same date. The clam warden removed the nets and had them piled up on the shore of the harbor. He also removed the 'no trespass' signs. The nets were not new, but were strong enough to prevent effective clam digging in areas over which they were placed. . . . On June 13, 1930, by order of the selectmen dated June 10, 1930, the entire harbor was thrown open to digging, but only to licensed diggers who must be citizens of Barnstable and who were to supply town trade only. The daily take of any individual was limited to four hods, or about four fifths of a barrel. The town had previously, on March 4, 1930, instructed the selectmen to make shellfish regulations. This was the first action of this sort ever taken by the town, but the selectmen had previously made certain regulations on April 1, 1928. The orders of 1930 were made under G. L. c. 130, § 84, and not under the two special statutes of 1911 and 1914. The effect of these orders of 1930, if valid, was to throw the Howes grants open to general digging and to limit Howes or any other diggers to four hods a day.

Under them he had no rights on the location of his own and the other grants on which he had worked from 1911 to 1926 which any other licensed digger could not enjoy. By an order dated December 1, 1930, the whole harbor was closed to digging."

Other material findings are stated in the opinion. By order of *Wait,* J., there were entered an interlocutory decree overruling exceptions of the plaintiff to the master's report and confirming the report, and a final decree dismissing the bill. The plaintiff appealed from both decrees.

*H. A. Baker & J. H. Beale,* for the plaintiff.

*C. C. Paine,* for the defendants.

PIERCE, J. This is a bill in equity wherein the plaintiff seeks to enjoin continuing trespasses upon a sand flat in the waters of Barnstable Harbor and any interference with his private clam fishery therein, the assessment of damages for the carrying away of his personal property, and consequential damages for the injury to his clam fishery. The case was referred to a master and is before this court on the appeal of the plaintiff from an interlocutory decree overruling his objections to the master's report and confirming said report, and from the final decree dismissing the bill.

The defendants took no objection to the master's report. The plaintiff objects to the report "in so far as the master admitted testimony tending to impeach plaintiff's title, and the title of grantors to plaintiff" to the tract numbered 109 in the allotment in 1697 by the town of Barnstable. (See records of the town of Barnstable, vol. 1, page 256.)

The facts, as they appear in the master's report, disclose in substance that "The people of Barnstable and vicinity, up to recent years, dug clams in Barnstable Harbor without regulation or particular claim of ownership in flats or clams." In 1911 there were few clams left in the harbor. In that year the plaintiff, and others, induced the Legislature to enact St. 1911, c. 499, which empowered the selectmen of Barnstable to grant, for not more than five acres, and for not more than five years to any individual, the exclusive right to cultivate and take clams. On or

about November 1, 1911, the selectmen, pursuant to the statute, granted license to the plaintiff and to four others to grow and to dig clams in Barnstable Harbor on the flat east of Slough Point, so called, near the junction of Great Creek and what the license calls Scorton Creek. After receiving his grant, Howes built a scow, and in the next two years brought from the main land several loads of marsh turf and mud to provide a rough surface on his grant and on adjoining grants which he purchased so as to catch a "set." He also planted several patches of thatch to form islands and break up tidal currents. He dug elsewhere, and planted in long furrows, which he made with a hand plow, many bushels of clams. Later he transplanted clams from spots on his own and the purchased grants where clams grew thickly to spots where there were few or none. In these ways he planted in the vicinity of one hundred bushels of clams. In 1916 the selectmen, under St. 1914, c. 43, renewed Howes's license for a period of ten years from November 1, 1916. During the next year two of the four original grants were renewed by the selectmen and the plaintiff bought their rights. After he had acquired the extension of his own grant and the assignment of the others he continued to use the nine acres, and derived considerable income from them.

Howes's grant expired November 1, 1926. On October 6, 1926, he applied for and was refused an extension of his exclusive rights in the location covered by his existing license. The Stevens and Carlson grants, which the plaintiff held by assignments, did not expire until February 17, 1927, and he was not molested by the authorities in his use of these grants until after their expiration. Under date of November 10, 1926, Howes obtained a deed from one Hannah, a deed without covenants purporting to convey one hundred five acres more or less of marsh land and flats including the area in question. He did not rely upon it at the trial or in argument before the master, and does not rely on it in the appeal to this court. Between February 17, 1927, and August 24, 1927, other clam diggers were

apparently free to dig in the area covered by the Howes grant and many did so.

On June 6, 1927, one Dottridge was appointed shellfish constable or clam warden by the town, to work under the direction of the selectmen. On August 24, 1927, the selectmen closed a portion of the harbor including the grants in question, prohibiting the taking of shellfish until further notice. If the closing was valid, Howes was prevented from digging what he regarded as his own clams from his own grant. He put up stakes and signs indicating his ownership to prevent others from digging. On September 24, 1927, he dug clams from the area without a permit and sold them for market purposes. Criminal complaint was made against him in the District Court at Barnstable. He was convicted. On appeal to the Superior Court he was tried on an agreed statement of facts, found guilty, and on a report of the case for the determination of this court the judgment was affirmed. *Commonwealth* v. *Howes*, 270 Mass. 69.

Howes made an examination of the titles to the marsh lands adjoining the flat on which his grant was located, and obtained five deeds from persons purporting to be successors in title to persons receiving original allotments of marsh land in 1696–1697. These deeds were all quitclaim in form, all ran to the plaintiff, and each purported to convey "all my right, title and interest" in and to a certain allotment. The first three of these deeds were not relied on at the hearing before the master because it then appeared that there is at present a well defined channel at all tides at the north of the flat and between it and allotments, and no reliance in terms is placed on these deeds in the brief now before this court. The remaining two deeds, dated June 3 and 4, 1930, respectively, described the premises which they purported to convey as follows: "All my right, title and interest as a descendant of James Cobb in the land in Barnstable Harbor, being allotment by the Town of Barnstable numbered 109 in the records of the Town of Barnstable, Volume I, page 256, being particularly de-

scribed as 'the northward part of Slow Island divided athwart by stakes ye eastermost stake marked CVIIII.' Including in this conveyance all my right, title and interest in and to the flats and shellfish appurtenant to said allotment numbered 109." Both deeds were duly sealed, acknowledged and recorded. The allotment itself numbered 109 reads as follows: "Lot #109 to James Cobb heirs. 'Is the. Northward part of Slow Island divided Athwart by Stakes, ye Eastermost Stake marked CVIIII.'"

The plaintiff's title to the clams when his grants expired in 1926 and were not renewed, if he has such, rests on his cultivation of them, and on the various things he had done to reduce them to possession and make them his private property. These acts of propagation, cultivation, reduction to possession and of protection against the public were all done with full knowledge that the grants might not be renewed. His title to the clams when he took the Cobb and Peak deeds, as he contended at the trial before the master, was that of an owner in common with others in the entire area of flats adjacent to Slough Island, with proprietary right in the clams and the land in which they were located. It was and is his further contention that the defendants were trespassers who could not justify any interference with his operations on his own property.

It is plain that the fundamental issue in the case with the burden of proof on the plaintiff is: What title, if any, did the plaintiff acquire to the flats and shellfish by the deeds of Cobb and Peak in 1930? As respects the Slough Island allotment, the master found that "There was no actual evidence on which . . . [he] could base a finding that the physical conditions of Slough Island, the flat in question and the water between were in 1697 what they were in 1930," that those who received the allotment numbered 109 in 1697, or those who succeeded them in title, ever made any claim to the flat in question or exercised or attempted to exercise any control or dominion over it before the plaintiff did in 1930. At the time of the hearing before the master the extreme outer end of Slough Point was lower than the marsh land to the west of it, and the

indications, from the character of the surface and the thatch, not marsh grass, growing upon it were that it was probably under water during part of every tide. The small ditch between Slough Point and Slough Island was choked with mud and thatch for much of its length, and there was no water except drainage water in part of it for at least one hour before low tide. Slough Island was of the same character as the point, and for much of its area muddy and covered with thatch and not marsh grass. A portion of it was above mean high water level. The master states that the physical condition of the island and flat on the day of the trial was as follows: "Between the Island and the flat on the day we visited it, and the visit was at a very low tide, was a low area in which water ran out into the harbor for most of the period of our visit. At the last of the ebb tide the water had subsided into very shallow pools which could be easily crossed in many places or into thin trickles of water connecting them. This low area was plainly above the low tide level of that particular day and only sand bars and drainage water from the marsh near by kept it from becoming comparatively dry. Before all the drainage water had run or seeped away the incoming tide covered the space. I find, however, that there was no defined channel on that date. I am unable to find what may have existed at the date of the allotment in 1697. There was evidence that the conditions had not changed materially during the last twenty years and I so find." He further found that the "stakes" referred to in the deeds and allotment "have disappeared and the location and direction of the division line across the Island, which would determine where, if extended, it would intersect the flat, if it did not pass to the south of it, cannot be determined with any certainty." Basing this finding solely on the description "Northward part of Slow Island" he found "that the division line extended would have passed south of the flat on which the grants were located and that Slough Island is the only parcel of land to which, if there were no channel between, the flat could be said to be at all connected. The portion of the flat on which the Howes grant was located

lies a little east of north from the easterly point of Slough Island." He states that the evidence warrants no more exact findings. As to the title of Lawrence M. Cobb and William H. Peak who delivered quitclaim deeds to Howes on June 4 and 3, 1930, respectively, the master states: "The evidence established that the original James Cobb left eleven children surviving him. One of his sons, James, married and left ten children surviving him. One of James Jr.'s sons, Jesse, married and left five children. One of Jesse's children, Joseph, married and left three children. One of them, another Joseph, married and left six children surviving him; two have died during his life. One of his sons, William, married and left six children surviving and two died during his lifetime. It was under this last William Cobb that the grantors to Howes claimed. There was no systematic attempt at the trial to trace out the various interests of the various descendants of the original James, and whether at any time the parcel was so alienated that Howes' grantors had the entire title or none at all was not established."

It is obvious (1) that the plaintiff has failed to establish by evidence that the grantors Cobb and Peak had any title in 1930 to the northerly half of Slough Island; (2) that assuming the grantors Cobb and Peak had some legal interest in allotment numbered 109 such interest is too indefinite and inexact for a conveyance of title to land; and (3) that if the location of allotment numbered 109 could be definitely shown, the plaintiff has failed to prove that the division line across the island extended would intersect the granted flat. The plaintiff, however, contends that, irrespective of ownership of allotment numbered 109 and the fact that the flat appurtenant to the allotment cannot be ascertained with any exactness or certainty, he has acquired an adverse title to the flats granted him through the deeds of Cobb and Peak, and the possession of the flats by putting nets and signs on them; that he has occupied the flats by putting nets and signs on them; that the defendants are not owners of the flats, and consequently, they had no right to enter upon the land in his possession and were guilty of

trespass in removing the nets and signs. In a word, the plaintiff claims to be a disseisor, and as such to have title good against all the world except the owner of the flats.

The spreading of nets and the erection of signs on the granted flat without ownership, and without enclosure, were not effective to destroy the public right to take shellfish on the shore and flats below high water mark and within one hundred rods of the upland. *Lakeman* v. *Burnham*, 7 Gray, 437. *Proctor* v. *Wells*, 103 Mass. 216. *Packard* v. *Ryder*, 144 Mass. 440. *Henry* v. *Newburyport*, 149 Mass. 582. Assuming that the plaintiff, in 1930, acquired title to allotment numbered 109 and to the flats as appurtenant to the land allotted the plaintiff, he did not acquire title to the clams in what was then a public shellfishery by the spreading of nets and the erection of signs on the flats. Nor did such acts give him the right to take the clams from the flats without a proper permit from the selectmen of Barnstable. *Weston* v. *Sampson*, 8 Cush. 347, 354. Even if the owner of flats may prevent the public from taking shellfish if he obstructs the exercise of the public right in a substantial manner by enclosure, such power to obstruct requires legislative sanction before it can become effective. G. L. (Ter. Ed.) c. 91, §§ 14–23. In the instant case it is to be noted that the plaintiff made such an application to the department of public works, that a hearing was had thereon and he was given leave to withdraw on June 11, 1930. It was decided in *Locke* v. *Motley*, 2 Gray, 265, cited by the plaintiff, that the riparian owner may drive stakes between high and low water marks so as to interfere with public fishing and that such acts give the public no right of action, but the decision does not support the plaintiff's contention that he has the right to take clams in the soil because he has driven stakes and laid nets which interfere with or entirely prevent the digging of clams by the public. It is to be noted that the grant of the lot to the exclusive use of the plaintiff, in 1911, expired by limitation in 1926; that between 1926 and 1930 the clams in the granted flats became a part of the public shellfishery in Barnstable Harbor, regardless of the fact that the plaintiff

during his license for 1911 to 1926 did acts constituting artificial propagation. *Keene* v. *Gifford,* 158 Mass. 120, 123. The plaintiff having no title to flats through the allotment of number 109, and no title to the flats or clams other than such as arises from an adverse holding of flats and clams, can have no right of action in the nature of trespass against the individual defendants, who, as public officers, assert the rights of the public in the clam fishery under G. L. (Ter. Ed.) c. 130, § 84. *Commonwealth* v. *Hilton,* 174 Mass. 29. *Commonwealth* v. *Howes,* 270 Mass. 69.

*Interlocutory decree affirmed.*

*Final decree affirmed with costs.*